******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.*
# CHARLES ALCENAT
# (AC 47150)

Moll, Westbrook and Wilson, Js.

*Syllabus*

Convicted, after a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor and drugs, the defendant appealed. He claimed, inter alia, that the evidence was insufficient to support his conviction. *Held*:

The evidence was sufficient to support the defendant's conviction, as the jury reasonably could have determined that the cumulative force of the evidence established beyond a reasonable doubt that the defendant was under the influence of intoxicating liquor and drugs while operating his motor vehicle in that he had been driving erratically, had failed to properly perform certain sobriety tests and had refused to submit to a breath or urine test while in police custody, which permitted the jury to infer that he was intoxicated pursuant to statute (§ 14-227a (a) (1)).

The trial court properly denied the defendant's motion to suppress evidence and testimony pertaining to his behavior in erratically driving his vehicle out of a parking lot and onto a street where he was arrested, as the court's finding that the defendant had not been seized in the parking lot was not clearly erroneous, the court correctly determined that the police seizure of the defendant on the street was supported by reasonable and articulable suspicion, and the record was inadequate to review the defendant's unpreserved claim that the police lacked a reasonable basis to conduct a patdown search of his person.

This court declined to review the defendant's claim that the trial court abused its discretion by allowing the police officer who initially interacted with the defendant to testify as an expert witness on horizontal gaze nystagmus testing, as that claim was inadequately briefed.

The trial court did not violate the defendant's right to due process and jury unanimity by declining to instruct the jury that it was required to agree specifically as to whether it was intoxicating liquor, any drug or both that caused the defendant's intoxication, as each method constituted an alternative means of intoxication under § 14-227a (a) (1), and the jury was not required to be unanimous as to the exact method of intoxication.

The record was inadequate to review the defendant's unpreserved claim that the trial court violated his state and federal constitutional rights to freedom of speech by requiring him to attend and pay for a victim impact panel as a special condition of his probation, as the defendant made no evidentiary presentation relating to his claim.

Argued October 15, 2025—officially released July 14, 2026

*Procedural History*

Substitute information charging the defendant with the crime of operating a motor vehicle while under the influence of intoxicating liquor and drugs, brought to the Superior Court in the judicial district of Hartford, geographical area number twelve, and transferred to geographical area number fourteen, where the case was tried to the jury before *K. Doyle, J.*; thereafter, the court denied the defendant's motion to suppress certain evidence; verdict of guilty; subsequently, the court denied the defendant's motions for a judgment of acquittal and for a new trial, and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed*.

*Jon L. Schoenhorn*, for the appellant (defendant).

*Nicholas L. Scarlett*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Casey Flynn Bennett*, assistant state's attorney, for the appellee (state).

*Opinion*

MOLL, J. The defendant, Charles Alcenat, appeals from the judgment of conviction, rendered against him following a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor and/or drug (OUI) in violation of General Statutes §14-227a (a) (1).[1] On appeal, the defendant claims that (1) the evidence presented at trial was insufficient to support

---

[1] General Statutes §14-227a (a) provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle (1) while under the influence of intoxicating liquor or any drug or both . . . ."

Since the events underlying this appeal, the legislature has amended §14-227a in ways that have no bearing on the merits of the present case. See Public Acts, Spec. Sess., June 2021, No. 21-1, §§116 and 117; Public Acts 2025, No. 25-110, §49; Public Acts 2025, No. 25-159, §13. In the interest of simplicity, we refer in this opinion to the current revision of the statute.

his OUI conviction under § 14-227a (a) (1), (2) the trial court improperly denied his motion to suppress evidence stemming from the alleged unlawful search and seizure that preceded his arrest, (3) the trial court abused its discretion by allowing one of the arresting police officers to testify as an expert witness regarding horizontal gaze nystagmus testing,[2] (4) the trial court violated his constitutional right to due process and a fair trial by not issuing a specific unanimity instruction to the jury regarding an essential element of the charge of OUI, and (5) the trial court erred by requiring him to attend and pay for a victim impact panel conducted by Mothers Against Drunk Driving (MADD) as a special condition of his probation. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our disposition of the defendant's claims. On November 5, 2020, at approximately 2:30 a.m., Officer Shannon Murphy of the Manchester Police Department saw a lone vehicle in the parking lot of Dollar General, a retail store, in Manchester while patrolling the area in her police cruiser. The vehicle's engine was running and the vehicle was stopped, but was not in park, when Officer Murphy initially saw it. Officer Murphy proceeded to pull up behind the vehicle to read its license plate for investigation because she "wanted to make sure it wasn't a stolen vehicle that someone had maybe parked there and walked away. [She] wanted to make sure the occupants of the vehicle were okay. [She] just wanted to see what was going on more." She was unable to see into the vehicle when she approached it in her cruiser, as it

---

[2] "The horizontal gaze nystagmus test measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other. The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct." (Internal quotation marks omitted.) *State* v. *Colon*, 232 Conn. App. 122, 126 n.4, 335 A.3d 848, cert. denied, 353 Conn. 901, 341 A.3d 959 (2025).

was nighttime and the car had tinted windows. Officer Murphy believed that the window tints exceeded the legal limit because she could not see into the vehicle whatsoever. Upon her approach behind the vehicle, Officer Murphy called through her police radio to report that she had encountered a suspicious vehicle. Once Officer Murphy had pulled behind the vehicle, it slowly moved away to the exit of the parking lot. Despite there being a "no left turns" sign displayed at the parking lot exit and a white "right turn only" arrow painted on the ground in the exit lane, the vehicle's left turn signal was activated, and the vehicle turned left out of the parking lot onto Center Street during which its rear driver's side tire went over the mounted curb in the middle of the exit and entranceway to Center Street. Officer Murphy had turned on her cruiser's emergency lights by the time the vehicle had approached the exit lane in an attempt to pull the vehicle over for the window tint violation and for rolling through a stop sign at the parking lot exit, as well as to check on the vehicle's occupants. When the vehicle turned left out of the parking lot onto Center Street, Officer Murphy turned off her vehicle's emergency lights per police policy so as not to engage in a pursuit.

Once on Center Street, the defendant's vehicle went into a left turn only lane as it approached the intersection of Center Street and Broad Street before cutting over to the adjacent center lane and continuing straight on Center Street through the intersection. Officer Murphy exited the parking lot and followed the vehicle, whereupon she observed it proceeding down Center Street until it pulled over onto the sidewalk, mounting its passenger side tires onto the sidewalk, despite there being room for street parking on either side of the road. Upon pulling up behind the stopped vehicle, Officer Murphy turned on her cruiser's emergency lights and initiated a motor vehicle stop as a result of the vehicle's suspicious course of action. The vehicle continued moving forward until Officer Murphy approached its passenger side door on foot. The vehicle's passenger side window was rolled down by the time Officer Murphy approached the vehicle,

and she noticed the defendant in the driver's seat and a female in the front passenger seat. Officer Murphy asked the defendant to put the vehicle in park. The defendant initially was "kind of confused about what was going on and why [Officer Murphy] was talking to them." Officer Murphy asked the vehicle's occupants why they had parked in the Dollar General parking lot and were now on the sidewalk, to which they answered that they had been trying to determine whether one of the vehicle's doors was open.

Shortly thereafter, Sergeant Daniel Pilz and Officer John Loud of the Manchester Police Department arrived. Sergeant Pilz parked his cruiser in front of the defendant's vehicle to prevent it from leaving because "the reason [he] was responding [was] that [he] heard that the car had taken off on one of the officers." Once he approached the driver's side door of the defendant's vehicle, Sergeant Pilz asked the defendant to turn off the vehicle's engine and step out of the vehicle because he "felt like [they] were dealing with someone who had not been cooperative to this point [and he] wanted to control the scene and make sure it was safe." Despite Officer Murphy's having previously instructed the defendant to put the car in park and the defendant saying that he had done so, the car jerked backward when the defendant attempted to exit the vehicle. Officer Loud and Sergeant Pilz performed a patdown search of the defendant next to his driver's side door after he had exited the vehicle because Sergeant Pilz "deemed him as being a potential threat" in light of Sergeant Pilz' understanding that he "had already taken off on an officer." During the patdown search, Sergeant Pilz removed, with the defendant's consent, keys located in his pocket, as well as other items not relevant to this appeal.

After the patdown search, Sergeant Pilz, Officer Loud, and Officer Murphy spoke to the defendant behind his vehicle. At that point, the defendant "was kind of just rambling. He was talking about . . . what he did for work. How he was a project manager and hired Manchester

police officers. He said that at first he didn't see [Officer Murphy's emergency] lights [when she had activated them in the Dollar General parking lot], and then he said that he saw [Officer Murphy's emergency] lights [the second] time because [she] was in a straight line. [He was saying] [j]ust a lot of . . . random things. Like random facts." The defendant informed the officers that he and his passenger were at a hookah bar down the street prior to being parked in the Dollar General parking lot. Notwithstanding that Officer Murphy had not activated her emergency lights for the second time until she had pulled behind the defendant's vehicle while it was parked on the sidewalk, the defendant claimed that he stopped when he saw Officer Murphy's emergency lights activated the second time. Thereafter, Sergeant Pilz and Officer Loud walked the defendant over to the front of Officer Murphy's cruiser to speak to him, while Officer Murphy went back to speak to the female passenger, who remained in the defendant's vehicle. At that point, Sergeant Pilz looked into the defendant's eyes while shining a flashlight in them, and he observed that the defendant's pupils "appeared pinpoint . . . ." Additionally, at some point while at the scene, Officer Loud detected the smell of alcohol coming from the defendant, who was wearing a mask.[3]

Officer Murphy formed the belief that the defendant may have been under the influence of an intoxicating substance on the basis of his driving patterns, his speech when she was talking to him, and his droopy eyes. When questioned by Officer Murphy, the defendant denied drinking any alcohol but stated that he had smoked hookah. Officer Murphy proceeded to conduct field sobriety tests on the defendant, starting with a horizontal gaze nystagmus test. For this test, she instructed the defendant to "keep [his] head perfectly still and to follow [her] finger in front of [his] face" and to "touch the tip of [her] finger" to ensure that he could properly see it. Prior to initiating the horizontal gaze nystagmus

---

[3]The parties stipulated to the jury "that November of 2020 was one of the high points of the COVID-19 pandemic."

test, Officer Murphy requested that Officer Loud turn off her takedown lights, which he did.[4] Officer Murphy observed "[d]istinct and sustained nystagmus" in each of the defendant's eyes and saw six out of six "clues," meaning that the defendant did not perform the test to standard.

Officer Murphy next had the defendant conduct the "walk and turn" test. Despite Officer Murphy's having demonstrated the test in part for the defendant and providing him with instructions, the defendant did not perform the test to standard, as he took fourteen more steps than instructed, stepped offline, and used his arms for balance. The third and final field sobriety test that the defendant conducted was the "one-legged stand" test, whereby he was required to hold his foot in the air for roughly thirty seconds. The defendant performed this test to standard. On the basis of the defendant's overall performance of the field sobriety tests, Officer Murphy determined that "he was impaired and could not safely operate a motor vehicle." At that point, Officer Murphy placed the defendant under arrest. Once at the police station, Officer Murphy offered the defendant the opportunity to take a urine or breath test, which the defendant refused by his conduct.

The defendant subsequently was charged with OUI in violation of § 14-227a, failure to obey an officer's signal in violation of General Statutes § 14-223 (a), and failure to drive on the right side of the road in violation of General Statutes § 14-230 (a).[5] By way of an amended information dated August 24, 2023, the defendant was charged with a single count of OUI in violation of § 14-227a (a) (1). A jury trial took place on August 29, 30 and 31, and September 1, 2023. On September 1, 2023, the jury found

---

[4] On cross-examination by defense counsel, Officer Murphy testified that "[t]akedown lights are just kind of big extra spotlights on the top of our lightbar" on the roof of a police vehicle.

[5] Since the events underlying this appeal, the legislature has amended § 14-230 (a) in ways that have no bearing on the merits of the present case. See Public Acts 2025, No. 25-159, § 44. In the interest of simplicity, we refer in this opinion to the current revision of the statute.

the defendant guilty of OUI. On November 20, 2023, the trial court, *K. Doyle, J.*, sentenced the defendant to six months of incarceration, execution fully suspended, with eighteen months of probation and a $500 fine plus costs. As part of his probation, the court ordered the defendant to participate in a victim impact panel conducted by MADD. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first claims that the evidence presented at trial was insufficient to support his OUI conviction under § 14-227a (a) (1) and that the trial court erred in denying his three motions for a judgment of acquittal on that basis.[6] For the reasons that follow, we are unpersuaded.

Before addressing the merits of the defendant's claim, we set forth the following relevant legal principles and standard of review. "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven

---

[6]The defendant filed two written motions, one at the close of evidence and another following the guilty verdict, and he made an oral motion after the state had rested its case-in-chief.

facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Capasso*, 203 Conn. App. 333, 338–39, 248 A.3d 58, cert. denied, 336 Conn. 939, 249 A.3d 352 (2021).

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Nichols*, 226 Conn. App. 359, 374–75, 317 A.3d 861 (2024).

"[T]he jury is the arbiter of credibility. . . . With respect to a challenge to the sufficiency of the evidence, we note that [i]n considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Citations omitted; internal quotation marks omitted.) *State* v. *Roth*, 104 Conn. App. 248, 256, 932 A.2d 1071 (2007).

"[E]stablished case law commands us to review claims of evidentiary insufficiency in light of all of the evidence [adduced at trial]. . . . Moreover, even improperly admitted evidence may be considered . . . since [c]laims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." (Citation omitted; internal quotation marks omitted.)

*State* v. *Waters*, 214 Conn. App. 294, 302, 280 A.3d 601, cert. denied, 345 Conn. 914, 284 A.3d 25 (2022).

The defendant argues that there was no evidence that he consumed any intoxicating substance prior to operating his motor vehicle. He further argues that, contrary to testimony in the record, he was not slurring his speech, and his performance on the field sobriety tests and his alleged traffic law violations did not support the conclusion that he was intoxicated. The state argues in response that the evidence in the record concerning the defendant's "erratic operation of his motor vehicle," performance on the field sobriety tests, slurred speech, the smell of alcohol emanating from his breath, and his refusal to perform an alcohol chemical test constituted sufficient evidence to support the jury's verdict. We agree with the state.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found beyond a reasonable doubt that the defendant was under the influence of intoxicating liquor and/or drug while operating his motor vehicle. Although the defendant argues that his alleged "slurred speech" was in fact due to speaking while wearing a surgical mask and his "strong Haitian French-Caribbean accent," the totality of the circumstances supports the conclusion that the jury reasonably could have drawn, which was that the defendant was intoxicated. In particular, (1) Sergeant Pilz testified that, upon shining a flashlight into the defendant's eyes, the defendant's pupils "appeared pinpoint," which the use of narcotics could cause, (2) Officer Murphy testified that (a) she observed "[d]istinct and sustained nystagmus" in the defendant's eyes during the horizontal gaze nystagmus test, and (b) the defendant did not perform to standard on the "walk and turn" test, (3) Officer Loud testified that he could smell alcohol on the defendant's breath, and (4) there was evidence that the defendant had refused to submit to a breath or urine test while in custody.[7]

[7] See General Statutes § 14-227a (e) (1) ("In any criminal prosecution for a violation of subsection (a) of this section, evidence that the defendant

With regard to the defendant's refusal to submit to a breath or urine test, the trial court instructed the jury as follows: "Evidence has been offered that the defendant refused to submit to a breath or urine test. There has also been evidence offered that the defendant did not, in fact, refuse to take a chemical test. Whether, in fact, the defendant refused to take a chemical test is a question of fact for you to decide. If you find that the defendant did refuse to submit to such a test, you may make any reasonable inference that follows from that fact. You should understand that evidence of a refusal to take a test by itself is not sufficient to find the defendant guilty of the charged crime. Any reasonable inference that you draw from this evidence must be in accord with my earlier instructions on inferences . . . ." Thus, it was permissible for the jury to infer from the defendant's refusal to submit to a breath or urine test, if so found, that he was intoxicated. See General Statutes § 14-227a (e) (1); see also, e.g., *State* v. *Frazier*, 181 Conn. App. 1, 14, 185 A.3d 621 ("[I]t [is] permissible for the jury to infer from the defendant's refusal to submit to a Breathalyzer test that he had consumed alcohol. . . . It is reasonable to infer that a refusal to take such a test indicates the defendant's fear of the results of the test." (Citations omitted; footnote omitted; internal quotation marks omitted.)), cert. denied, 328 Conn. 938, 184 A.3d 268 (2018).

Additionally, the defendant's foregoing conduct occurred against the backdrop of evidence of his erratic driving, namely, that he had **(1)** failed to stop at a stop sign at the exit of the Dollar General parking lot, **(2)** took a left turn out of the parking lot despite there being a "no left turns" sign clearly posted and a white "right turn only" arrow painted on the ground in the exit lane, **(3)**

refused to submit to a blood, breath or urine test or the nontestimonial portion of a drug influence evaluation requested in accordance with section 14-227b shall be admissible provided the requirements of subsection (b) of said section have been satisfied. If a case involving a violation of subsection (a) of this section is tried to a jury, the court shall instruct the jury as to any inference that may or may not be drawn from the defendant's refusal to submit to such a test or evaluation.").

struck the curb upon taking the left turn, **(4)** made an abrupt lane shift prior to driving through the intersection of Broad Street and Center Street, **(5)** parked his car partially on the sidewalk on Center Street, and **(6)** had difficulty putting his car in park while it was on the sidewalk on Center Street.

In sum, upon the evidence construed in the light most favorable to sustaining the verdict and the inferences reasonably drawn therefrom, we conclude that the jury reasonably could have determined that the cumulative force of the evidence established guilt beyond a reasonable doubt. Thus, we conclude that the evidence was sufficient to support the defendant's conviction of OUI in violation of §14-227a (a)(1).

II

The defendant next claims that the trial court improperly denied his motion to suppress the "evidence and testimony pertaining to the defendant's behavior." For the reasons that follow, we disagree.

The following additional procedural history is relevant to our resolution of this claim. On March 18, 2021, the defendant filed a motion to suppress evidence obtained from the motor vehicle stop, search, and seizure that resulted in his arrest for OUI under §14-227a (a) (1). The defendant asserted that "[t]he initial seizure . . . was not supported by reasonable and articulable suspicion of criminal activity or motor vehicle violations," and "[t]he stop, seizure and arrest . . . were not supported by probable cause." The court did not conduct a separate evidentiary hearing on the motion to suppress; rather, by agreement of the parties, the evidence produced during the state's case-in-chief comprised the evidentiary record for the motion.[8] On August 31, 2023, after the state had rested its case-in-chief, the court heard argument on the motion to suppress. Following argument, the court

[8]After the state had rested its case-in-chief, upon inquiry from the court, defense counsel represented that the defendant was not seeking to offer any additional evidence in support of the motion to suppress.

orally denied the motion to suppress and stated that it would issue a written opinion at a later date.

On November 9, 2023, the court issued its memorandum of decision denying the motion to suppress. The court made factual findings derived from, inter alia, the testimony of Officer Murphy, Sergeant Pilz, and Officer Loud, as well as the officers' respective bodycam footage and Officer Murphy's cruiser dashcam footage, which were admitted into evidence. The court found credible all three officers' testimony regarding their interactions with the defendant, and it further found that Officer Murphy's testimony was corroborated by the bodycam and dashcam footage.

The court made the following relevant factual findings. Upon seeing the defendant's vehicle in the Dollar General parking lot, "Officer Murphy decided to approach the [vehicle] because she wanted to see why the car was in the lot at that time of the morning. Officer Murphy knew that there had been reports of people breaking into cars and of stolen cars in this area. She also wanted to see if there were any occupants in the [vehicle] that might need assistance." Officer Murphy "clearly had the right to investigate this situation" based on these facts. Officer Murphy believed that the defendant's window tints constituted a motor vehicle violation, as she was unable to see into the back of the vehicle as a result of the tints. Officer Murphy then witnessed the car pull toward the stop sign at the exit of the parking lot where the "exit is marked as a right turn only based on both a sign in the lot and the white arrow indicating right turn only painted on the parking lot exit onto Center Street." After turning on her vehicle's emergency lights, Officer Murphy witnessed the defendant's vehicle turn left out of the parking lot during which its rear driver's side tire went over the mounted curb in the middle of the exit and entranceway to Center Street.

"At that point, Officer Murphy had observed several motor vehicle violations: (1) the improperly tinted rear

windows, **(2)** the failure to fully stop at the stop sign, and **(3)** the defendant's failure to obey her signal."

After watching the defendant's vehicle exit the Dollar General parking lot, Officer Murphy watched it enter a left turn only lane at the Broad and Center Street intersection; the defendant's vehicle, however, proceeded to "swerve at the last instant to the center lane and continue eastbound on Center Street past the Broad Street intersection." The defendant then drove farther down Center Street, and "[t]he evidence conclusively showed that the defendant stopped on his own volition, because Officer Murphy had neither caught up to him nor activated her overhead lights." Further, although there was a breakdown area large enough to park a car, the defendant pulled his vehicle up onto the sidewalk with only one front tire and one rear tire in the roadway. By then, "Officer Murphy had not only observed the motor vehicle violations listed above, but she also saw the defendant **(1)** drive over the mounted curb divider when turning onto Center Street, **(2)** suddenly move from the left turn only to the center lane on Center Street, and **(3)** park partially on the sidewalk instead of in the breakdown lane on Center Street." She pulled up behind the vehicle, turned her vehicle's emergency lights on, informed the police dispatcher of her location, and approached the defendant's vehicle from its passenger side. Officer Murphy noticed upon approach that the gas cap was open and the vehicle was not yet in park. When questioned by Officer Murphy regarding why he did not stop when she turned on her vehicle's emergency lights in the Dollar General parking lot, "[t]he defendant responded that he did not see her lights when he left the lot. The defendant appeared confused by Officer Murphy's questioning and about why she stopped him." Although she observed the belt to the defendant's pants unbuckled, she did not observe any drugs or alcohol in the vehicle, nor did she smell alcohol on his breath during their interactions.

Upon the arrival of Sergeant Pilz and Officer Loud, Sergeant Pilz requested that the defendant turn off his

vehicle's engine and step out of the vehicle; however, "the defendant had difficulty turning his car off." The defendant's car then lurched forward, causing Officer Loud and Sergeant Pilz to step back and prompting Officer Murphy to remind the defendant that he previously had informed her that he had placed the car in park. The defendant finally put the car in park and turned its engine off. Once he exited the vehicle, Sergeant Pilz asked the defendant whether he had any weapons on his person. In response, the defendant did not answer the question directly; rather, he stated that he hired Manchester police officers for jobs routinely in his role as a project manager. The officers proceeded to pat down the defendant for weapons while he was restrained but did not find contraband or weapons in his possession. The court noted that "[t]he defendant [made] no claim concerning the validity of this patdown search because nothing of evidentiary value had been located during the patdown."

Although Sergeant Pilz did not smell alcohol on the defendant's breath during their interactions, he claimed that the defendant "appeared confused" and repeatedly talked about his job as a project manager, about which he was never asked. Sergeant Pilz also found it strange that the defendant did not realize that his belt was unbuckled and his fly was unzipped until the officers informed him so. After observing the defendant's eyes while shining a flashlight into them, Sergeant Pilz described his pupils as "pinpoint," a potential indicator of the use of an illegal substance. Sergeant Pilz did not find any evidence of contraband or drugs after retracing the path that the defendant previously had driven. Officer Loud previously observed that the defendant had difficulty exiting his vehicle and that his belt buckle was undone. Officer Loud stated that, although the defendant wore a surgical mask during their interactions and spoke with an accent, the defendant was stumbling over his words and slurring his speech. Of the three officers, Officer Loud was the only one to smell alcohol on the defendant's breath,

but he could not remember at which point during their interactions that he made that observation.

On the basis of its factual findings, the court determined that **(1)** the defendant was not seized in the Dollar General parking lot, **(2)** the defendant was seized after he had parked his car partially on the sidewalk on Center Street, **(3)** Officer Murphy had reasonable suspicion to detain the defendant on Center Street on the basis of the multiple traffic violations that she had observed him commit, and **(4)** the interactions with the officers during the detention justified expanding the detention to perform the field sobriety tests.

The defendant maintains that, in denying his motion to suppress, the court improperly determined that **(1)** he was not seized in the Dollar General parking lot, **(2)** his seizure on Center Street was lawful, and **(3)** the officers were justified in removing him from his car and subjecting him to an invasive search of his clothing. We consider these contentions in turn.

Before addressing the defendant's particular assertions, we set forth the applicable standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 331 Conn. 239, 246, 203 A.3d 1233 (2019).

## A

The defendant first asserts that the court improperly found that he had not been seized in the Dollar General parking lot pursuant to the Connecticut constitution.[9] We disagree.

[9]The court determined that the defendant had not been seized in the Dollar General parking lot under either the federal or state constitution.

"[I]n determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard." (Internal quotation marks omitted.) *State* v. *Lewis*, 333 Conn. 543, 560, 217 A.3d 576 (2019). "[A] person [is defined] as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining whether a seizure has occurred, so as to invoke the protections of our state constitution, we have stated that a court is to consider whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . . Whether there has been such a seizure in an individual case is a question of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Oquendo*, 223 Conn. 635, 647, 613 A.2d 1300 (1992). "The relevant inquiry . . . focuses on the degree of authority exhibited by the police officer during his interaction with an individual. Courts have identified several factors to consider in this regard. For example, a police officer may exhibit authority by restricting a defendant's freedom of movement or by isolating him in some manner. See *State* v. *Greenfield*, 228 Conn. 62, 71–72, 634 A.2d 879 (1993). A police officer may also exhibit authority by use of his marked police cruiser, parking his cruiser in close proximity to a defendant's vehicle, displaying weapons and approaching a defendant at a late hour in an isolated location area." *State* v. *Kimble*, 106 Conn. App. 572, 589, 942 A.2d 527, cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008).

The defendant does not contest the court's analysis of this issue under the federal constitution but, rather, limits his claim to the court's analysis under our state constitution. Further, we note that, in defining "seizure," our state constitution provides broader protection than does the federal constitution. See *State* v. *Oquendo*, 223 Conn. 635, 652, 613 A.2d 1300 (1992) (declining "to adopt the restricted definition of a seizure employed by the United States Supreme Court in [*California* v. *Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)] and adher[ing] to our precedents in determining what constitutes a seizure under the state constitution").

In determining that the defendant had not been seized in the Dollar General parking lot, the court determined that "[n]othing Officer Murphy did in the parking lot in any way prevented or impeded the defendant's freedom of movement as he exited the parking lot. More importantly, the defendant consistently told all the officers he never saw a police car with its lights on as he exited the parking lot. It logically follows that if the defendant never saw Officer Murphy's brief activation of her overhead lights as he exited the lot, he cannot now claim he had been seized in the parking lot. . . . The defendant's conduct in the parking lot and his initial statements to the officers about not seeing the police car when he exited the lot defeat his claim that a reasonable person in his position would have believed they were not free to leave. . . . Officer Murphy did not initiate a pursuit of the defendant's car after he ignored the brief activation of her overhead lights while exiting the . . . parking lot. The defendant stopped his car on his own about a half mile from the parking lot. After leaving the parking lot, Officer Murphy did not activate her overhead emergency lights until after parking behind the defendant . . . [on] Center Street. Therefore, the credible evidence establishes that the seizure of the defendant occurred after he parked . . . his car partially on the sidewalk."

We conclude that the court's finding that a seizure did not occur in the Dollar General parking lot was not clearly erroneous. In view of all the circumstances surrounding Officer Murphy's initial encounter with the defendant, a reasonable person in the defendant's place would have believed that he was free to leave. In his principal brief, the defendant likened the present case to *State* v. *Oquendo*, supra, 223 Conn. 635, arguing "that an officer's *attempt* to stop an individual—regardless of whether that person complies—constitutes a seizure under the Connecticut constitution." (Emphasis in original.) This assertion is misplaced, however, as our Supreme Court held that the defendant in *Oquendo* was seized when the officer physically approached, spoke to, and instructed the defendant to hand over his duffel bag

because a reasonable person in his position would not have believed that he was free to exit the interaction with the officer. *State* v. *Oquendo*, supra, 641–42, 653. Conversely, in the present case, although Officer Murphy exhibited authority by activating her vehicle's emergency lights in the parking lot, the defendant stated that he did not see her turn on her cruiser's lights. Because the defendant was not aware that Officer Murphy activated her cruiser's emergency lights in the parking lot, we cannot conclude that a reasonable person in the defendant's position would have believed that he was not free to leave.[10] See *State* v. *Hill*, 237 Conn. 81, 88 n.11, 675 A.2d 866 (1996) (noting that defendant had not been seized prior to seeing police officers in light of his testimony that he was not aware of them until they entered apartment that he was occupying). Accordingly, the court properly found that the defendant had not been seized in the Dollar General parking lot.

B

The defendant next argues that the court improperly determined that his seizure on Center Street was lawful under the state constitution. We are not persuaded.

"The federal law of search and seizure in this area is well settled. The fourth amendment to the federal constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides in relevant part that [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . . Certain seizures are reasonable under the fourth amendment even in the absence of probable cause if there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime. . . .

---

[10]The defendant also argues that Officer Murphy lacked probable cause or reasonable suspicion to believe that he was engaged in criminal activity in the Dollar General parking lot, thus making the alleged seizure there illegal. Because we conclude that the court properly found that the defendant was not seized in this instance, however, we do not reach this issue.

When a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect in order to confirm or dispel his suspicions. . . . During the course of a lawful investigatory detention, if the officer reasonably believes that the detained individual might be armed and dangerous, he or she may undertake a patdown search of the individual to discover weapons." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilkins*, 240 Conn. 489, 495–96, 692 A.2d 1233 (1997). "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) Id., 496.

"In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . . [E]ffective crime prevention and detection . . . [underlie] the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. . . . Therefore, [a]n investigative stop can be appropriate even where the police have not observed a violation

because a reasonable and articulable suspicion can arise from conduct that alone is not criminal. . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 75–76, 779 A.2d 88 (2001). "Our Supreme Court has held that even minor traffic violations . . . constitute crimes for which a valid investigatory stop may be made." *State* v. *Gordon*, 84 Conn. App. 519, 524, 854 A.2d 74, cert. denied, 271 Conn. 941, 861 A.2d 516 (2004).

"The question of whether a particular set of facts gives rise to a reasonable and articulable suspicion is a question of law over which we exercise plenary review." *State* v. *Haughwout*, 339 Conn. 747, 758, 262 A.3d 791 (2021). Moreover, "[w]e note that the standards we apply to our determination of whether a police seizure was justified by reasonable suspicion under our state constitution mirror those set forth by the United States Supreme Court with regard to fourth amendment claims." *State* v. *McCormack*, 132 Conn. App. 490, 496 n.5, 33 A.3d 264 (2011), cert. denied, 303 Conn. 932, 36 A.3d 694 (2012); see also id. (although state constitution provides higher standard of protection when considering whether individual was seized by police, standards governing whether seizure was justified by reasonable suspicion are same under federal and state constitutions).

In determining that the defendant's seizure on Center Street was lawful, the court stated that, because Officer Murphy could not see into the defendant's car in the parking lot as a result of the car's window tint, she reasonably believed that his windows were more tinted than legally permissible. Further, the court stated that Officer Murphy witnessed the defendant's not coming to a full stop at the stop sign in the parking lot. Additionally, the court reasoned that the defendant's driving away from Officer Murphy after she had activated her emergency lights,

having difficulty taking a left turn out of the parking lot and hitting the curb in the process, making a sudden move from out of the left turn only lane and proceeding straight through the intersection of Broad Street and Center Street, and pulling up onto the sidewalk rather than in the breakdown lane on Center Street amounted to articulable facts that constituted reasonable suspicion to justify the investigatory stop.

The defendant argues that the court erroneously relied upon three justifications for his seizure on Center Street: that his vehicle's window tints violated General Statutes § 14-99g; that he failed to stop at a stop sign in the Dollar General parking lot in violation of General Statutes § 14-301 (a); and that he failed to comply with Officer Murphy's signal to pull over when she turned on her emergency lights in the Dollar General parking lot in violation of § 14-223 (a). Regarding the rear window tint violation, the defendant argues that the court's findings were clearly erroneous because they were based on the court's misreading of the statute. Further, he argues that he did not violate § 14-301 (a) because the stop sign in the Dollar General parking lot was privately erected. Finally, the defendant asserts that he did not violate § 14-223 (a) because Officer Murphy's attempt to pull him over by turning on her emergency lights was ambiguous as to whether she actually was trying to have him pull over.

On the basis of the record, we conclude that the court properly determined that the investigatory stop on Center Street was justified by reasonable and articulable suspicion. The totality of circumstances regarding the defendant's behavior, as found by the court, provided a proper ground for pulling over the defendant and blocking him from leaving the scene. Moreover, even if, as the defendant posits, he did not violate any traffic laws prior to his seizure on Center Street, "a reasonable and articulable suspicion can arise from conduct that alone is not criminal." (Internal quotation marks omitted.) *State* v. *Lipscomb*, supra, 258 Conn. 76; see also *State* v. *Batts*, 281 Conn. 682, 692–93, 916 A.2d 788 ("[t]he

determinative question is not whether [the defendant] actually violated the [m]otor [v]ehicle [c]ode . . . but whether an objectively reasonable police officer could have formed a reasonable suspicion that [the defendant] was committing a code violation" (internal quotation marks omitted)), cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007). Accordingly, the court correctly determined that the seizure of the defendant on Center Street was supported by reasonable and articulable suspicion.

C

The defendant next argues that, even if he was seized lawfully, Sergeant Pilz and Officer Loud did not have a reasonable basis to conduct a patdown search of his person. The state argues, as a threshold matter, that we should decline to review this unpreserved constitutional claim for lack of an adequate record under the first prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). We agree with the state.

"[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

In *State* v. *Jenkins*, 298 Conn. 209, 222, 3 A.3d 806 (2010), the state argued that this court had "improperly considered the fact of an illegal patdown search in agreeing with the defendant's contention that his consent to search the [defendant's vehicle] was tainted by the previously performed illegal search." As an initial matter, the

state contended, and our Supreme Court agreed, that the defendant's claim was unpreserved because it was not raised in his motion to suppress, nor was it argued during the suppression hearing. Id., 222–23, 227. Declining to review the defendant's claim, our Supreme Court held that "the defendant's failure to litigate the validity of the patdown during the suppression hearing rendered the record inadequate for *Golding* review of [the] issue"; id., 223; because "the state was not alerted to the need to develop a factual record concerning whether potentially permissible bases . . . existed for the patdown search . . . ." (Footnote omitted.) Id., 231.

As in *Jenkins*, we conclude that the defendant's claim challenging the constitutionality of the patdown search of his person by Sergeant Pilz and Officer Loud is unpreserved and not reviewable on appeal. The defendant failed to raise the patdown claim in his motion to suppress or at trial. Indeed, in its decision denying the motion to suppress, the court pointed out that the defendant did not make any argument "concerning the validity of [the patdown] search because nothing of evidentiary value had been located during the patdown." Had the defendant raised his claim in his motion to suppress or at trial, the state would have been put on notice regarding whether it would be required to create a factual record pertaining to the validity of the officers' patdown search of the defendant, and the trial court could have made factual findings as to his claim. The record, however, is devoid of any reference to his current claim that there was no reasonable basis for the arresting officers to conduct a patdown search of his person. Thus, the first *Golding* prong has not been satisfied, as the record is inadequate to review the defendant's alleged claim of error in this regard. Therefore, we decline to review the defendant's argument on this issue.

### III

The defendant next claims that the trial court abused its discretion by allowing Officer Murphy to testify as an expert witness regarding horizontal gaze nystagmus

testing. Specifically, he argues that "[t]he trial court clearly abused its discretion in allowing Murphy to testify as an 'expert' on [horizontal gaze nystagmus]. Since this testimony constituted almost the entirety of evidence of alcohol consumption, the error was prejudicial to the defendant, requiring reversal." The state maintains that the defendant has abandoned this evidentiary claim because he failed to brief adequately whether any error was harmful. We agree with the state.

We begin with the applicable standard of review. "[I]f the improper admission of expert opinion testimony 'is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict.'" *State* v. *Tomlinson*, 340 Conn. 533, 547, 264 A.3d 950 (2021). "[T]o establish reversible error on an evidentiary impropriety, the defendant must prove *both* an abuse of discretion and a *harm that resulted from such abuse*." (Emphasis added.) *State* v. *Kirsch*, 263 Conn. 390, 412, 820 A.2d 236 (2003).

In the present case, the defendant bore the burden of demonstrating that the court's purported error in permitting Officer Murphy to testify as an expert witness regarding horizontal gaze nystagmus testing was harmful. The defendant dedicates a single sentence to the issue of harm, arguing that, "[s]ince [Officer Murphy's] testimony constituted almost the entirety of evidence of alcohol consumption, the error was prejudicial to the defendant, requiring reversal." In short, we deem this claim to be inadequately briefed and, therefore, abandoned. See *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 611, 254 A.3d 915 ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently

to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.)), cert. denied, 338 Conn. 911, 259 A.3d 654 (2021).[11] Therefore, we decline to review the defendant's claim of evidentiary error.[12]

IV

The defendant next claims that the trial court violated his constitutional right to due process and jury unanimity under the sixth and fourteenth amendments to the federal constitution and article first, §8, of the Connecticut constitution by not giving a specific unanimity instruction to the jury regarding an essential element of the charge of OUI.[13] For the reasons that follow, we are unpersuaded.

The following additional procedural history is relevant to our review of the defendant's claim. The defendant filed a motion to strike on August 18, 2023, seeking to

[11]Insofar as the defendant attempts to revive his claim regarding harm in his reply brief, the defendant "cannot use his reply brief to resurrect a claim that he has abandoned by failing to adequately brief it in his principal appellate brief. See *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010) (declining to consider claim when appellant raised 'vague assertion' of claim in principal appellate brief and later 'amplified her discussion of the issue considerably in her reply brief')." *Robb* v. *Connecticut Board of Veterinary Medicine*, supra, 204 Conn. App. 613 n.23.

[12]Even if the issue of harm were properly before us, there was ample evidence in the record of alcohol consumption other than Officer Murphy's expert testimony, including Officer Loud's testimony that he smelled alcohol emanating from the defendant, testimony concerning the defendant's erratic driving during the early morning in question, and testimony that the defendant refused to submit to chemical testing, which supported a reasonable inference that he did so because he feared the results of such testing.

[13]Although the defendant stated in his brief that his right to jury unanimity was protected under article first, §8, of the Connecticut constitution, he did not analyze his claim separately under the state constitution. Therefore, we decline to address his state constitutional claim.

replace the word "or" with the term "and" regarding the intoxication element of the charge of OUI in an information filed by the state on that same date, such that the phrase "while under the influence of an intoxicating liquor *or* drugs" would be changed to "while under the influence of an intoxicating liquor *and* drugs." The defendant argued in his motion that "[a] disjunctive information fails to allege a single offense in a single count, and therefore, fails to provide notice of which accusation is intended, potentially leading to a verdict with a nonunanimous jury." The state subsequently filed the operative amended information using the term "and" as requested by the defendant.[14]

At trial, prior to closing arguments, the defendant challenged the court's proposed written jury instructions, arguing that a specific unanimity instruction regarding whether the defendant was under the influence of intoxicating liquor or drug, or both, was required. The court ultimately rejected the defendant's argument. The next day, prior to charging the jury, the court permitted the parties to provide additional argument on the unanimity issue. Thereafter, the court again rejected the defendant's claim, reasoning in part: "The key is . . . whether . . . intoxicating liquor, any drug, or both [affect] the person's mental, physical, or nervous processes [to the point] that he lacks to an appreciable degree the ability to function properly in relation to the operation of his motor vehicle. That's the key element. And then it goes on to say the person's physical and mental capabilities must have been impaired to such a degree that he no longer has the ability to drive a vehicle with the caution characteristic of a sober person of ordinary prudence under the same or similar circumstances. I don't think this is conceptually distinct. I think the [court's] instruction properly explains it."

---

[14]Thus, the operative amended information provided in relevant part that the defendant was accused of OUI and "allege[d] that on or about November 5, 2020, in . . . Manchester . . . [the defendant] operated a motor vehicle on a public road, while under the influence of an intoxicating liquor *and* drugs." (Emphasis added.)

The court proceeded to instruct the jury that it was required to "unanimously find that the state has proven each element of the charged crime beyond a reasonable doubt to find the defendant guilty of [OUI]. It is not enough for the state to prove only certain of those elements. Because if proof of even one element is lacking, you must find the defendant not guilty."[15] The court further provided the following jury instructions regarding the intoxication element of §14-227a (a)(1): "The second element is that, at the time the defendant operated the motor vehicle, he was under the influence of intoxicating liquor, any drug, or both. A person is under the influence of intoxicating liquor, any drug, or both when, as a result of drinking such beverage, ingesting such drug, or both the person's mental, physical, or nervous processes have become so affected that he lacked to an appreciable degree the ability to function properly in relation to the operation of his motor vehicle. A person's physical or mental capabilities must have been impaired to such a degree that he no longer has the ability to drive a vehicle with the caution characteristic of a sober person of ordinary prudence under the same or similar circumstances." The defendant again challenged the court's decision not to provide a specific unanimity instruction after the court had charged the jury and in his September 6, 2023 motion for a new trial, which the court denied.

Against this backdrop, we set forth the following relevant legal principles and applicable standard of review. Our review of a trial court's decision not to give a specific unanimity instruction to the jury as requested by a defendant in a criminal trial is plenary. See *State* v. *Douglas C.*, 345 Conn. 421, 434–35, 285 A.3d 1067 (2022). Moreover, insofar as our analysis of the defendant's claim requires us to interpret §14-227a (a), our review

---

[15]The court also provided the jury with the following general unanimity charge: "If you unanimously find that the state proved beyond a reasonable doubt each of the elements of driving while under the influence, then you shall find the defendant guilty. On the other hand, if you unanimously find that the state has failed to prove beyond a reasonable doubt any of the elements, you shall then find the defendant not guilty."

also is plenary. See *Civic Mind, LLC* v. *Hartford*, 229 Conn. App. 615, 637, 328 A.3d 225 (2024) (questions of statutory interpretation are subject to plenary review), cert. denied, 351 Conn. 919, 333 A.3d 103 (2025).

"Although the federal constitutional right to jury unanimity clearly applies in both state and federal courts, what is less clear is precisely what the jury must be unanimous about. Detailing the scope of the unanimity requirement, the United States Supreme Court has explained that a jury cannot convict unless it unanimously finds that the [g]overnment has proved each element of the offense charged. . . . Nevertheless, the court has recognized that different jurors may be persuaded by different pieces of evidence, even when they agree [on] the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues [that] underlie the verdict. . . . In other words, a jury must agree on the principal facts underlying its verdict—what courts have tended to call the elements of the offense. But that requirement does not extend to subsidiary facts—what the [Supreme] Court has called brute facts. . . . [I]n the routine case, a general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even [when] an indictment alleges numerous factual bases for criminal liability. . . . The court has clarified that alternative means of committing a crime constitute underlying brute facts: [F]or example, [the court has] sustained a murder conviction against the challenge that the indictment on which the verdict was returned was duplicitous in charging that death occurred through both shooting and drowning. In holding that the [g]overnment was not required to make the charge in the alternative . . . [the court] explained that it was immaterial whether death was caused by one means or the other." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Douglas C.*, supra, 345 Conn. 438–39.

In *Douglas C.*, our Supreme Court recognized that "there are two distinct kinds of unanimity

claims—unanimity as to elements and unanimity as to instances of conduct—and . . . different tests apply to these claims." Id., 432–33. "[T]his first kind of unanimity claim involves the question of 'when is a disputed fact—e.*g.*, whether the crime occurred on a Monday or a Tuesday, with a knife or a gun, against this or that victim—one that the jury must unanimously agree [on], and when is it merely dispensable detail [i.e., element vs. means]? And the second [involves the question]: when is a defendant's conduct one violation of a statute, and when is it many?'" Id., 440. "[A] claim of unanimity as to elements implicates different concerns than a claim of unanimity as to instances of conduct. Specifically, for claims of unanimity as to elements, unanimity concerns arise from the statutory language or scheme at issue. . . . The concern . . . is whether the statutory language creates multiple elements, each of which the government must charge as a separate offense, or alternative means of committing an element." (Citation omitted.) Id., 441. To resolve such a claim, "the court must determine whether the statutory provisions, subsections, or clauses constitute separate elements of the statute, thereby requiring jury unanimity, or alternative means of committing a single element, which do not require jury unanimity . . . ." *State* v. *Joseph V.*, 345 Conn. 516, 530–31, 285 A.3d 1018 (2022). It is undisputed that this case involves a claim of unanimity as to an element of the crime of OUI.

"To determine whether multiple statutes, statutory provisions, or statutory clauses constitute separate elements or alternative means of committing a single element . . . we consider the statutory language, its legislative history, the overall structure of the statute at issue, relevant legal traditions and practices, moral and practical equivalence between the alternative actus rei or mentes reae, and any other implications for unfairness associated with the absence of a specific unanimity instruction." *State* v. *Inzitari*, 351 Conn. 86, 109–10,

329 A.3d 215, cert. denied, U.S. , 145 S. Ct. 2787, 222 L. Ed. 2d 1080 (2025).

In *State* v. *Inzitari*, supra, 351 Conn. 86, our Supreme Court engaged in such an analysis. In *Inzitari*, the defendant was convicted of possession of child pornography following a jury trial. Id., 88. The statute pursuant to which the defendant was convicted, General Statutes (Rev. to 2019) § 53a-196d (a) (1), "require[d] proof that [he] possessed fifty or more visual depictions of child pornography." Id. The defendant argued on appeal "that his right to a unanimous jury verdict under the sixth amendment to the United States constitution required the court to instruct the jury that it needed to be unanimous as to which fifty of the fifty-seven images in evidence fit the definition of child pornography and on precisely which category of sexually explicit conduct that each of the fifty or more images fell within." Id., 106. More specifically, he argued "that the charge of possessing fifty or more visual depictions of child pornography require[d] the jury to be unanimous on precisely which category of 'sexually explicit conduct'—sexual intercourse, bestiality, masturbation, sadistic or masochistic abuse, or lascivious exhibition of the genitals or pubic area of any person—that each one of the fifty images fell within for purposes of determining whether they constituted child pornography. He essentially argue[d] that the charge was duplicitous because these categories constitute[d] elements of the offense, which require[d] jury unanimity." Id., 109. Our Supreme Court analyzed the elements of § 53a-196d and determined that the trial court was not required to issue a specific unanimity instruction. Id., 110–12. The court reasoned that "the jury was not required to be unanimous as to which fifty images were relied on to satisfy the quantity element of the offense because, like the categories of sexually explicit conduct, different images are merely the means of proving the elements of the offense. . . . Although the jury was required to be unanimous on the bottom line—that the defendant possessed a minimum of fifty visual depictions of child pornography—it need not have been unanimous as to the exact fifty images or category of sexually explicit

conduct depicted in those images." (Citation omitted.) Id., 111–12.

The court in *Inzitari* relied on the following example from *Mathis* v. *United States*, 579 U.S. 500, 506, 136 S. Ct. 2243, 195 L. Ed. 2d 604 (2016), which we also find instructive. "[S]uppose a statute requires use of a deadly weapon as an element of a crime and further provides that the use of a knife, gun, bat, or similar weapon would all qualify. . . . Because that kind of list merely specifies diverse means of satisfying a single element of a single crime—or otherwise said, spells out various factual ways of committing some component of the offense—a jury need not find (or a defendant admit) any particular item: A jury could convict even if some jurors conclude[d] that the defendant used a knife while others conclude[d] he used a gun, so long as all agreed that the defendant used a deadly weapon." (Internal quotation marks omitted.) *State* v. *Inzitari*, supra, 351 Conn. 111.

In the present action, the defendant argues that the court was required to instruct the jury that, in order to convict the defendant of OUI, it was required to agree specifically as to whether it was intoxicating liquor, any drug, or both that caused the defendant's intoxication. We disagree.

Section 14-227a (a) provides in relevant part: "A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle (1) while under the influence of intoxicating liquor or any drug or both, or (2) while such person has an elevated blood alcohol content. . . ." The plain language of §14-227a (a) (1), stated in the disjunctive, reveals that a motor vehicle operator can be under the influence for purposes of the statute in one of three ways: intoxicating liquor, any drug, or both. This list merely prescribes the various means of satisfying the "under the influence" element of the offense. Thus, we conclude that the jury was required to be unanimous on the bottom line that the defendant operated his motor vehicle while under the influence; it

was not required to be unanimous as to the exact method of intoxication. See *State* v. *Inzitari*, supra, 351 Conn. 111–12. Stated differently, whether the defendant was under the influence by means of intoxicating liquor, any drug, or both is merely a subsidiary, or "brute," fact; *State* v. *Douglas C.*, supra, 345 Conn. 438–39; as each method constituted an alternative means of intoxication under § 14-227a (a) (1). *State* v. *Inzitari*, supra, 112. Accordingly, the court was required only to provide a general unanimity instruction to the jury, which it did.

In sum, we conclude that the court did not violate the defendant's constitutional right to due process and jury unanimity by declining to issue a specific unanimity jury instruction regarding the second element of the charge of OUI.

V

The defendant's final claim is that the trial court erred by requiring him to attend and pay for a victim impact panel conducted by MADD as a condition of his probation. The defendant argues that the court's imposition of this probation condition violates his right to freedom of speech under the first amendment to the federal constitution and article first, §§ 4 and 5, of the Connecticut constitution because the victim impact panel would be "conducted by an advocacy group" and the group "lobbies for stricter motor vehicle laws and penalties . . . ." He further asserts that being required to pay for his participation in the MADD program constitutes compelled speech and, thus, a first amendment violation. We conclude that this unpreserved claim is unreviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, because the record is inadequate for review.

The following additional procedural history is relevant to our resolution of the defendant's claim. At the November 20, 2023 sentencing, the court ordered the defendant to participate in a victim impact panel conducted by MADD as a condition of his probation

pursuant to its discretion under § 14-227a (*l*).[16] Defense counsel requested that the defendant's attendance at a victim impact panel conducted by MADD not be required as a probation condition, stating in his objection: "And I would just ask that the court not impose the impact panel by MADD, and that's because that's, I think, one of the things that, when a person takes the program, I understand that's something that the court imposes. I don't think that the court needs to do that. It's an advocacy organization, and it's something that's voluntarily done as part of . . . taking . . . the [victim impact panel] program." The court denied defense counsel's request.

As a threshold matter, the defendant asserts that his claim is preserved because, at sentencing, he "objected to the MADD condition of probation because it was conducted by an advocacy group." Alternatively, if the claim is deemed unpreserved, he seeks *Golding* review. We deem the defendant's distinct constitutional claim regarding the victim impact panel to be unpreserved because he failed to raise it in the trial court. That is, he made no reference at sentencing to any potential violation of his right to free speech under the federal or state constitution in his objection to the special condition of probation.

We conclude that the record is inadequate to review the defendant's claim of error and, thus, fails under

---

[16]General Statutes § 14-227a (*l*) provides: "If the court sentences a person convicted of a violation of subsection (a) of this section to a period of probation, *the court may require as a condition of such probation that such person participate in a victim impact panel program* approved by the Court Support Services Division of the Judicial Branch. Such victim impact panel program shall provide a nonconfrontational forum for the victims of alcohol-related or drug-related offenses and offenders to share experiences on the impact of alcohol-related or drug-related incidents in their lives. Such victim impact panel program shall be conducted by a nonprofit organization that advocates on behalf of victims of accidents caused by persons who operated a motor vehicle while under the influence of intoxicating liquor or any drug, or both. Such organization may assess a participation fee of not more than seventy-five dollars on any person required by the court to participate in such program." (Emphasis added.)

*Golding*'s first prong.[17] The only record properly before us with respect to this specific claim is the November 20, 2023 sentencing transcript. At sentencing, there was no evidentiary presentation relating to his claim on appeal that, by virtue of the fact that (1) MADD is the organization that would conduct the victim impact panel and (2) he would attend such program involuntarily, the special condition of probation is unconstitutional. To support his claim, the defendant relies, for the first time on appeal, on material outside of the record, including information from the MADD Connecticut website and the Judicial Branch bid portal. The record simply is devoid of a factual record that would enable us to analyze the defendant's contention that the condition of probation "force[d] him to subsidize MADD's legislative agenda" and resulted in a violation of the defendant's free speech rights. Accordingly, in the absence of a sufficient factual record, we deem the defendant's claim to be unreviewable pursuant to *Golding*'s first prong.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17]A constitutional challenge to a special condition of probation may be subject to *Golding* review. See *State* v. *Stephens*, 301 Conn. 791, 797–99, 22 A.3d 1262 (2011) (challenge to probation condition failed under third *Golding* prong because alleged constitutional violations did not exist).